## PURE OIL CO. v. TUCKER.
### No. 372.

District Court, S. D. Iowa, C. D.

Feb. 13, 1947.

Allen C. Hutcheson, Jr. and Ben A. Harper, both of Chicago, Ill., and Donald Evans (of Carr, Cox, Evans & Riley), of Des Moines, Iowa, for Pure Oil Co.

Howard L. Bump, of Des Moines, Iowa, and Joe M. Johnston, of Knoxville, Iowa, for defendant Tucker.

DEWEY, District Judge.

### Findings of Facts.

(1) The plaintiff, an Ohio corporation, on September 1, 1939, entered into a written contract to sell the defendant, L. D. Tucker, who resides in Knoxville, Iowa, real estate, filling station, equipment, bulk station, and personal property for the sum of $32,000.00 on contract, $3,500.00 down, and the balance in monthly payments. Under the contract the defendant went into possession of the property, made payments as required by the contract until the first day of September, 1944, when defendant refused further payments, and on that date there was a balance due The Pure Oil Company of $15,200.00 with interest at three per cent.

(2) At the same time the said real estate contract was executed by the parties, a contract called Supply Contract, Exhibit (1) of the record, was executed on September 1, 1939, to run for a period of five years. The contract required Tucker to sell Pure Oil products exclusively and provided a penalty for a breach thereof.

(3) The defendant, Tucker, performed the said contract on his part by purchasing all of his petroleum products from the plaintiff during the period of the contract. The plaintiff, as provided in its contract, supplied Tucker petroleum products which he ordered during the period of the contract.

(4) The Supply Contract provided, and both The Pure Oil Company and Tucker knew, that House Brand gasoline, so-called, and other petroleum products would be shipped in interstate commerce from plaintiff's source of supply in Group 3 in Oklahoma.

(5) Both parties knew that the price of House Brand gasoline, Ethyl, and Excel gasoline and other petroleum products would fluctuate from time to time during the period of the contract.

(6) The standard fixed by the parties in the contract for House Brand gasoline that was to be sold by the plaintiff to Tucker was the price currently posted at the Madison Zone Office of the seller on day and date of shipment, except as modified by the contract. The price was made up by the Pure Oil Company and was partly determined upon the quotations in the Chicago Journal of Commerce, F.O.B. Group 3 quotations each day between the high and the low.

The price thus determined by The Pure Oil Company in its Chicago office, was forwarded to its Madison office by letter, known as the market letter, establishing the price of House Brand gasoline for the day's sales. When an order for gasoline was received from Tucker, plaintiff would add to market letter quotation a charge for rail freight from Group 3 to Knoxville, Iowa, and bill the defendant, Tucker, which he paid, for such charge in the invoices for gasoline. Price of Ethyl gasoline was the same basis, but higher, and third grade, was on the same basis, but lower than House Brand gasoline.

From September 1, 1939, to June 11, 1941, the transportation charge added to the price set by Pure and posted at its Madison Zone Office reflected the amount of actual transportation charges paid or incurred in such shipments of gasoline to defendant, Tucker.

That after June 11, 1941, to September, 1, 1944, the inclusion of the all rail freight charge in the invoices to, and paid by Tucker, did not reflect the actual transportation costs as shown in the tariffs as published by the Great Lakes Pipeline Company paid or incurred by The Pure Oil Company for shipments of gasoline and were in excess of the transportation costs paid by plaintiff in the movement of gasoline to defendant from Group 3 to Knoxville, Iowa.

That the standard set in the contract was not followed after June 11, 1941, but was arbitrary and fictitious in that it included in the price and invoices billed to and paid by Tucker, a sum in excess of the actual transportation paid or incurred by The Pure Oil Company.

(7) Part of the Ethyl gasoline shipped to Tucker was made from House Brand gasoline by the Pure Oil Company by directing the Great Lakes Pipeline Company to add Tetra Ethyl Lead and Coloring at the Des Moines terminal, and then shipped to Tucker by tank car or transport truck.

(8) The Pure Oil Company had no storage facilities of its own at Des Moines. It did, however, have the privilege under the provisions of Pipeline Tariffs of storing petroleum products which had been shipped by pipeline, in facilities owned by the Pipeline Company at Des Moines, Iowa. The undisputed evidence shows that at all times material to this controversy The Pure Oil Company had on hand in the Pipeline facilities in Des Moines an adequate supply of petroleum products to fill all orders received from defendant, Tucker.

(9) During the period of the contract, September 1, 1939, to Sept. 1, 1944, The Pure Oil Company purchased gasoline of refineries in Group 3 and shipped the same over the Great Lakes Pipeline to Des Moines and then continued the shipment to defendant, Tucker, at Knoxville, in tank car or tank truck lots. During all of the period of time herein involved The Pure Oil Company paid the transportation charges to the Great Lakes Pipeline Company as per its published tariffs.

(10) On June 11, 1941, the Interstate Commerce Commission findings as to Great Lakes Pipeline Company's tariff became

effective and the transportation charges between Group 3 and Des Moines were reduced below the all rail rate and such transportation charges so continued to the end of contract to be less than all rail rate between Group 3 and Des Moines, Iowa. The railroad rate charged by The Pure Oil Company was in excess of actual transportation paid or incurred by The Pure Oil Company in the sales of gasoline to the defendant, Tucker.

(11) That L. D. Tucker discovered the overcharges sometime late in 1941, or early in 1942, and made demand upon The Pure Oil Company to correct the overcharge, which The Pure Oil Company refused to do. His contract required him to purchase his petroleum products from the plaintiff, and a penalty for failing so to do, and he was purchasing a valuable property, and at all times owed the plaintiff more upon the purchase price on the property than his claim for overcharges.

(12) That defendant, L. D. Tucker, made a written tender to The Pure Oil Company on November 10, 1944, which tender he made good and continued in his pleadings, in the sum of $5,505.71, which sum so tendered on the 10th of November, 1944, was more than L. D. Tucker owed the plaintiff on the said date.

(13) That the Pure Oil Company canceled the Supply Contract with L. D. Tucker by written notice dated July 26, 1944, effective September 1, 1944.

(14) The difference in the actual transportation costs paid by The Pure Oil Company to transport gasoline from Group 3 to Tucker by Pipeline, and amount charged to and paid by Tucker between June 11, 1941 and September 1, 1944, amounts to $10,188.66.

(15) That from September 1, 1939 to September 1, 1944, The Pure Oil Company was a stock share owner of the Great Lakes Pipeline Company.

(16) The Court further finds that a stipulation was signed by the parties and filed herein upon the trial acknowledging the truth of certain facts therein stated. The Court finds that the facts stated in said stipulation are true and adopts the same to the same extent as if they were set out in detail in these findings.

## Conclusions of Law.

1. A sales contract covering a period of time, and for delivery of merchandise in the future, to be valid, should have a definite price for the product to be sold, or a method or manner of arriving at that price which can be deduced with reasonable certainty by the parties, from the contract.

2. That at the time the contract here involved between the parties for the purchase of gasoline and petroleum products by the defendant, was entered into, The Pure Oil Company had a prepared, printed form, which in effect provided the method and manner of arriving at the purchase price of gasoline, which should be the delivered price as fixed by The Pure Oil Company and posted at its zone office in Madison, Wisconsin.

3. That at the time of the preparation of the said printed contract between The Pure Oil Company, and at the time of the execution of the gasoline purchase contract by the parties, the pipeline rate and the railroad freight rate were the same.

4. That at the time the printed form of contract was prepared by The Pure Oil Company and at the time of its execution by the defendant, the usual and proper method of arriving at a delivered price as known to the oil trade and recognized by it and by the parties to this agreement, was: The spot-cash price in tank-car lots of gasoline in Group 3 were collected and a conclusion reached from these sales in that territory from which the gasoline was to be shipped by arriving at a reasonable average of these spot-cash gasoline tank-car prices, and where the contract as in this case provided for a delivered price, then by adding thereto the actual transportation charges from the point of shipment to the place of delivery.

5. That the method of arriving at the posted price at Madison, Wis., by the Pure Oil Company was based upon the foregoing conclusion with the additional allowance, for excess of gasoline or a shortage that would probably affect the cash price of

tank-car lots, and this was arrived at by the Pure Oil Company at their Chicago office on each day and sent to the Madison Zone office where this price was accepted as the posted price for the product. Where the delivered price was to be considered, then the addition was the actual freight charges in addition to the price fixed in the above manner.

6. That this method of arriving at the delivered price was known to the trade and to the parties here at the time of the execution of the contract, and of the sale and delivery of the different allotments of gasoline to the defendant herein.

7. That the contract is ambiguous in Section 5 thereof and a proper interpretation of the contract requires a consideration of all its provisions in the light of the facts and circumstances and usages and customs of the trade.

Taking these matters into consideration and especially the provisions of the contract with reference to Sec. 7 "Deliveries", where shipments are to be made in tank cars loaded at the refinery or other storage of the seller, which means the point of shipment, and Sec. 8, "Freight," wherein provision is made for the fixing of the price in the event of changes in freight rates during the terms of the agreement and especially where a new rate shall apply to shipments made subsequent to such changes, a proper interpretation of the contract is as above set out; that is, that the method and manner of arriving at the price of the product on any one day was to be as above set out, and that the fixing and addition of the freight rates was never intended to be an arbitrary fixing of a freight rate, but the actual cost of transportation.

8. That to permit the contract to be interpreted as claimed by the plaintiff, to be based upon spot tank-car prices plus an arbitrary railroad rate of transportation, when the said products were shipped in a different manner, would permit an arbitrary and capricious method of arriving at the sale price and would if used or permitted to be used, invalidate the contract entirely, as it would not be a proper method and manner of arriving at a fair delivered price, as was intended by the provisions of the contract and

the parties thereto at the time of its execution.

9. After June 11, 1941, when the pipeline tariff was reduced below the railroad freight rate, The Pure Oil Company then used the method and manner of arriving at a delivered price by adding to the spot tank-car price at point of origin, the railroad freight rate instead of the actual transportation charges paid or guaranteed by it to the pipeline, and this was not only an arbitrary and capricious method, but was outside and beyond the proper interpretation of the contract, and such method of arriving at the delivered price was illegal.

10. After June 11, 1941, to Sept. 1, 1944, The Pure Oil Company in fixing the delivered price therefor, by the addition of railroad freight rates being illegal, was an exaction by the plaintiff from the defendant of a larger amount than was called for by a proper interpretation of the contract, and therefore the defendant is entitled to recover for that illegal and unjust exaction in an amount determined by the difference between the actual cost of transportation of the gasoline by pipeline and the railroad freight rate charged by The Pure Oil Company.

11. The defendant Tucker, by his paying for gasoline as was billed to him, and making protest thereof, did not waive a known right, nor did he intend to waive any rights against The Pure Oil Company for such overcharges.

12. The defendant Tucker on the 10th of November, 1944, tendered to The Pure Oil Company the sum of $5505.71, which with the amount of his claim allowed, is in excess of the amount due from him to the plaintiff. The plaintiff would be entitled to recover $15,200.00 with interest at 3% from September 1, 1944, to November 10, 1944, less the sum of $10,188.66, the amount of Tucker's claim allowed herein. Interest will stop on both claims as of that date.

13. The defendant, Tucker, should have 30 days from the date of entry of the decree in which to pay the Clerk of this Court for the benefit of the plaintiff the amount found due between the plaintiff's and the defendant's claims and if so paid, shall discharge all indebtedness due from Tucker to the

770

plaintiff. Upon the payment of the said sum, the plaintiff shall execute and deliver to defendant, Tucker, a deed or deeds for the real estate described in the plaintiff's complaint, and such assignments or Bill of Sale to effectively transfer to Tucker full title to the property in accordance with said contract.

14. Plaintiff will be entitled to draw a decree of foreclosure in the case setting out the amount due from the defendant to the date of tender and providing that unless the defendant pays the difference in the amount within 30 days after that date, then foreclosure will be absolute. If payment is made, it shall be in full payment and discharge of his indebtedness to the plaintiff.

15. Costs shall be taxed to plaintiff.

16. The plaintiff shall have an exception and the defendant an exception to anything found in the Findings of Fact and Conclusions of Law and to the Decree.